# INTERNATIONAL HARVESTER CREDIT CORP. ET AL. *v.* GOODRICH ET AL., CONSTITUTING THE STATE TAX COMMISSION OF NEW YORK.

No. 82.   Argued January 17–18, 1956.—Decided April 9, 1956.

*John Lord O'Brian* argued the cause for appellants. With him on the brief were *Charles A. Horsky, Robert L. Randall* and *John T. De Graff.*

*James O. Moore, Jr.,* Solicitor General of New York, argued the cause for appellees.   With him on the brief were *Jacob K. Javits,* Attorney General, *Sidney Kelly, Jr.,* Assistant Attorney General, and *Walter V. Ferris,* Deputy Assistant Attorney General.

Mr. Justice Burton delivered the opinion of the Court.

The State of New York imposes a highway use tax upon motor carriers operating heavy vehicles on its public highways. Many such vehicles are purchased and operated under conditional sales agreements, and certain conditional vendors here question the extent to which the State may subordinate the vendors' security interests to the State's lien for taxes owed by the carrier. The vendors question the constitutionality of any grant of priority to the State's lien, over their rights in particular trucks, insofar as the lien is made applicable to taxes based upon the carrier's operation of other trucks within the State, whether before, or during, the time that the carrier has operated the particular trucks within the State. The vendors object, likewise, to any priority for the lien as applied to taxes assessed against the carrier after the vendors have repossessed the particular trucks, even though the taxes are based upon the carrier's operations on the State's highways before such repossession.[1] For the reasons hereafter stated, we sustain the State's priority in each instance.

International Harvester Credit Corporation, a Delaware corporation, and Brockway Motor Company, Inc., a New York corporation, as plaintiffs (now appellants), with the members of the State Tax Commission of New York as defendants (now appellees), submitted this controversy to the Supreme Court of the State of New York, Appellate Division, Third Department, on stipulated facts, pursuant to § 546 of the Civil Practice Act of New York. Appel-

---

[1] We do not have before us the validity of the attempted subordination of a conditional vendor's security interest in a truck sold to and operated by a carrier where the tax is measured by any use of the highways by the carrier *after* the truck has been repossessed by its vendor. Such a claim was made in this case but it was abandoned by the State.

lants sought a declaratory judgment that the liens asserted by the State were not superior to the conditional vendors' interests in certain trucks and that Article 21 of the Tax Law was unconstitutional, insofar as it prescribed the priorities to which they objected.[2] Appellants also asked that the bonds filed by them to secure payment of the taxes be canceled and returned.

With one judge not voting, the Appellate Division decided in favor of appellees, sustaining generally the State's liens and priorities.[3] 284 App. Div. 604, 132 N. Y. S. 2d 511. On appeal, taken as a matter of right, that judgment was affirmed by the Court of Appeals of New York, with one judge dissenting. 308 N. Y. 731, 124 N. E. 2d 339. On appeal to this Court, under 28 U. S. C. § 1257 (2), we noted probable jurisdiction. 350 U. S. 813.

The stipulated facts may be summarized as follows: From January 1, 1952, through February 1954, Eastern Cartage and Leasing Co., Inc., here called the "carrier," was a domestic corporation owning at least 15 motor vehicles. As a motor carrier it operated these vehicles over the public highways of the State of New York subject to the highway use tax imposed by Article 21 of the Tax Law, *supra*. That tax was imposed upon the "carrier" or "owner," and those terms did not include

---

[2] Article 21 of the Tax Law, effective October 1, 1951, imposed a tax for the privilege of operating on the highways of New York motor vehicles having a gross weight of over 18,000 pounds each. McKinney's N. Y. Laws, §§ 501 (2) and 503. The tax was computed on a graduated scale beginning at six mills per mile for vehicles of between 18,001 and 20,000 pounds. The scale rose to 35 mills for trucks weighing between 74,001 and 76,000 pounds, with an additional two mills per ton and fraction thereof above that weight. The tax was determined by multiplying the number of miles operated over the highways of the State by the rate for the appropriate weight group. *Id.*, § 503.

[3] The lien was not upheld as to any taxes which accrued after repossession of the trucks.

the conditional vendor of trucks operated by the motor carrier.[4]   It was payable with the monthly returns.[5]

In recognition of the administrative difficulties involved in enforcing and collecting this tax, in contrast to a flat rate tax, or one measured by gross receipts, the statute prescribed extensive remedies, as well as penalties, civil and criminal (see § 512 of the Tax Law), to protect the interest of the State.[6]   The provisions for the State's lien covering the points at issue are as follows:

"§ 506.   Payment of tax

.           .           .           .           .

"The fees, taxes, penalties and interest accruing under this article shall constitute a lien upon all

---

[4] "Such tax shall be upon the carrier except that where the carrier is not the owner of such vehicular unit, the tax shall be a joint and several liability upon both."   Tax Law, § 503.   And see the following interpretation of the above sentence by the Attorney General of New York which we accept:

"In my opinion, the statute does not intend the inclusion of 'a conditional vendor' in the word 'owner.'   The joint and several liability imposed upon an owner other than the carrier is designed to cover those who lawfully place the use and control of vehicles in the hands of others for operation upon the highways under circumstances and arrangements which do not look to divestiture of their own proprietary interests.   A conditional vendor, on the other hand, retains legal title as a special interest, protecting the unpaid purchase price of the vehicle.   The transaction looks to defeasance of all his interest if completed in accordance with its terms.

.           .           .           .

"I conclude that a conditional vendor is not an 'owner' subjected to personal liability for the highway use tax as such."   Rep. Atty. Gen. N. Y., Op., 219, 220 (1954).

" 'Carrier' shall include any person having the lawful use or control, or the right to the use or control of any motor vehicle."   Tax Law, § 501 (5).

[5] Tax Law, §§ 505, 506.

[6] The Legislature adopted the weight-distance principle of taxation as a substitute for the State's former system of fuel taxes and license

motor vehicles and vehicular units of such carrier. The lien shall attach at the time of operation of any motor vehicle or vehicular unit of such carrier within this state and shall remain effective until the fees, taxes, penalties and interest are paid, or the motor vehicle or vehicular unit is sold for the payment thereof. Such liens shall be paramount to all prior liens or encumbrances of any character and to the rights of any holder of the legal title in or to any such motor vehicle or vehicular unit." McKinney's N. Y. Laws, Tax Law.

From January 1, 1952, through February 1954, the carrier incurred, and failed to pay, highway use taxes of $3,158.77, plus penalties and interest of $539.27 through April 21, 1954. The taxes carried interest at 1% per month. While neither appellant knew anything of these delinquencies until the State asserted them in April 1954, it is also true that neither appellant had inquired of the carrier or of the State as to their possible existence.[7]

---

fees. It rejected proposals imposing flat fees or measuring the tax by gross receipts. N. Y. Leg. Doc. No. 67 (1951) 65–80.

"The legislature hereby finds and declares that the operation of heavy motor vehicles upon the highways of this state greatly increases wear and damage on such highways; that there is. a direct relationship between the weight of the vehicle using such highways and the damage done to them; that the period of usefulness of such highways is shortened by such use; that the effect of such use is to create and augment hazards to pedestrians and other traffic and to impose on the state a heavier financial burden for highway construction, maintenance and policing than does the operation of smaller vehicles; that the provisions of this article are therefore necessary and are hereby enacted to distribute more equitably this financial burden and to compensate the state in part for the privilege granted to such heavy vehicles of using the highways of the state and for the cost of administering state traffic regulations." Laws 1951, c. 74, § 1, McKinney's N. Y. Laws, Tax Law, Historical Note, 711.

[7] During the time material here, § 514 of the Tax Law forbade the disclosure by the State of information concerning such tax delin-

In February and March 1953, while the carrier was operating under the Highway Use Tax Act, International Harvester Company, a foreign corporation doing business in New York State, sold two tractors to the carrier for $8,253 each.[8]  In each such transaction, the carrier executed and delivered to the vendor a conditional sales agreement for $6,541.  The agreements were assigned by the vendor to the International Harvester Credit Corporation, one of the appellants herein, and were properly filed in the office of the Clerk of the Town of Rotterdam, Schenectady County, New York.  Each truck was operated by the carrier on the public highways of New York State and remained in the carrier's possession and control until repossessed January 26, 1954.  The carrier was then delinquent under its sales agreements to the extent of $4,578.79 on each truck, and the vendor bought them in at public sale.  It resold one to a purchaser in New York and the other to a purchaser in Massachusetts.

.Comparable facts relate to the truck sold the carrier by appellant Brockway Motor Company.  Its sales price was $7,257; the conditional sales agreement was for $6,757.  The repossession took place March 26, 1954, when $5,625 was owed to the vendor.  The record shows no disposal of the truck.

April 21, 1954, the State asserted its lien on each truck for the entire amount of the highway use tax delinquencies of the carrier, totaling $3,698.04.[9]

---

quencies and made it a misdemeanor to divulge information as to the tax returns.  Those restrictions have now been relaxed.  Tax Law, 1955 Cum. Pocket Pt., 24.

[8] The "tractors" were motor vehicles subject to Article 21.  They constituted the automotive portion of tractor-trailers and are referred to in this opinion as trucks.

[9] The lien sustained against International was for $3,409.78, with interest on $2,884.61 at 1% per month from April 21, 1954.  That against Brockway was for $3,698.04, with like interest on $3,158.77

There is no dispute as to the amount of the tax due to the State nor of the claim that such sum is due from the carrier.[10]   There also is no controversy as to the validity of the State's lien against the respective trucks for such part of the tax as is measured by the operation of each on the State's highways.

The issue, accordingly, has been narrowed by the parties to the validity of the subordination of the rights of the respective conditional vendors of these trucks to the State's lien for any part of the carrier's delinquent taxes that exceeds the sum determined by the operation of the trucks on the State's highways.   To the extent of such excess, the vendors claim that the statutory lien deprives them of property without due process of law in violation of the Fourteenth Amendment to the Federal Constitution.

Separate factual considerations are presented by the State's lien (1) for the taxes measured by the carrier's operation of trucks other than the three here in question, and (2) for the taxes measured by the carrier's operation of trucks *before* its first operation of the respective three trucks in question.   The principle which supports the State's priority of lien is, however, the same in both instances.   That principle supports also the priority of the State's lien as dating from the time of the carrier's first operation of the respective three trucks within the State. This holds good even though no assessment of the tax

---

from the same date.   The trucks in New York State have been released on bond.   As to the truck in Massachusetts, the State has asserted a lien against the proceeds of its resale.

[10] The constitutionality of the tax, as distinguished from the constitutionality of the liens prescribed for its collection, is not now contested. *Mid-States Freight Lines, Inc.* v. *Bates,* 279 App. Div. 451, 111 N. Y. S. 2d 578, aff'd without opinion, 304 N. Y. 700, 107 N. E. 2d 603, cert. denied, 345 U. S. 908.   See also, *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542.

was made by the State until after the respective trucks had been repossessed by their conditional vendors. The State's claim of priority for its lien depends, in each instance, upon its constitutional right to enforce the collection of all taxes due it from the motor carrier for the latter's use of the highways of New York under a statute giving ample notice of the tax and of the provisions for its collection.

There is no doubt that the State may impose and enforce a lien covering all taxes owed to it by a carrier for the privilege of using the State's highways, where such lien applies to vehicles owned by the carrier free and clear of encumbrances. The lien for such taxes may be enforced against any or all of such trucks, regardless of whether the taxes accrued from the carrier's operation of one or the other of such trucks, or even whether they accrued from the carrier's use of the highways before its acquisition and operation of any of the particular trucks subjected to the lien. Likewise, the lien unquestionably could attach to the trucks as of the time of their first use by the carrier within the State. See *United States* v. *Alabama,* 313 U. S. 274, 280–282. Such liens are simple illustrations of the State's exercise of its prerogative right to impose a statutory lien for delinquent taxes upon the taxpayer's property. See *Marshall* v. *New York,* 254 U. S. 380, 382–384. A State is entitled to wide discretion in such matters.

The controversy arises here because, for the present purposes, the State treats the three trucks now before us in the same manner as it does the carrier's unencumbered trucks. The vendors, relying upon their conditional sales agreements, deny this right. The State does not dispute the validity of those agreements. The State, however, treats them as security interests rather than as absolute interests. The State emphasizes the action of the vendors in yielding control of the trucks to the carrier thus

enabling the carrier to operate them on the State's highways. The burden placed on the highways has been precisely the same as though the carrier had held unencumbered title to the trucks.

Looking at the situation from another point of view, New York has an unquestionable right to regulate the use of conditional sales agreements within the State. The prescribed priority of its highway tax liens over the rights of conditional vendors may be regarded, therefore, as in the nature of a supplement to the New York Uniform Conditional Sales Act. McKinney's N. Y. Laws, Personal Property Law, Art. 4.

New York subjects each carrier to a reasonably computed tax for the use of its highways and, in order to collect that tax, places a statutory lien upon all motor vehicles operated by the carrier within the State. The carrier here was the beneficial owner and operator of the three trucks during the time it had possession of them. The conditional sales agreements provided the vendors with security for payment of the purchase price of the trucks. As long as the carrier kept up its payments, the possession and control of the trucks were in the carrier and its use of them on the highways had the same effect on those highways as though the trucks had been paid for in full.[11]

---

[11] "The parties to a conditional sale have divided property interests in the goods. The buyer is the beneficial and substantial owner, with such attributes of ownership as possession, use and control, and has his equity of redemption sedulously guarded by the law. The seller, on the other hand, reserves title to the goods solely as security for payment or performance by the buyer. Essentially a conditional sale is only a credit device. Its plain and obvious purpose is the same as a purchase-money chattel mortgage despite technical or theoretical differences between the two forms of security." *Schnitzer* v. *Fruehauf Trailer Co.*, 283 App. Div. 421, 431, 128 N. Y. S. 2d 242, 253, aff'd without opinion, 307 N. Y. 876, 122 N. E. 2d 754; 2 Williston on Sales (rev. ed. 1948) § 330 *et seq.*

The enforcement of this lien rests upon principles known to the law in other connections. A landlord's lien for unpaid rent long has been enforceable against personal property found on the premises in the possession of the tenant, even though the legal title to such personal property may be in a third party who has allowed the tenant to have possession and beneficial use of it. *Spencer* v. *M'Gowen,* 13 Wend. (N. Y.) 256.[12]

The highway use tax is not assessed on the conditional vendor or on the vendor's trucks as such. It is a tax assessed on the carrier and the lien for its collection is imposed on the trucks in the carrier's possession which have been operated by it on New York's highways. The State asserts no personal liability on the part of either of the appellants. The State's claim is limited to its lien as set forth in a statute which was in effect more than a year before the respective appellants sold their trucks to the carrier. While it is not a condition of the validity of the State's lien, it is obvious that vendors of trucks, as well as carriers, derive substantial benefits from the State's costly construction and maintenance of its highways for heavy traffic. The reasonableness of the lien is thereby emphasized. Cases condemning attempts by States to compute one person's tax by reference to the income or activities of another are not persuasive here. The tax here is on the carrier and it is computed with reference to the carrier's own use of the highways. This statutory lien does not destroy the efficacy of conditional sales financing. Practically, it suggests that the conditional vendors secure assurance from their carrier-customers that the latters' highway use taxes are not in arrears.

---

[12] See also, as to the innkeeper's lien, *Waters & Co.* v. *Gerard,* 189 N. Y. 302, 82 N. E. 143, and as to the agister's lien, *Corning* v. *Ashley,* 51 Hun 483, 4 N. Y. S. 255, aff'd without opinion, 121 N. Y. 700, 24 N. E. 1100. And see *Hersee* v. *Porter,* 100 N. Y. 403, 3 N. E. 338.

While the State would not, at common law, have a lien to the extent here asserted, that is far from saying that the lien, when imposed by statute, is arbitrary or unreasonable and, therefore, lacking in due process.

Justice Cardozo said for this Court in *Burnet* v. *Wells,* 289 U. S. 670, 677–678:

> "The controversy is one as to the boundaries of legislative power. It must be dealt with in a large way, as questions of due process always are, not narrowly or pedantically, in slavery to forms or phrases. 'Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed—the actual benefit for which the tax is paid.' *Corliss* v. *Bowers, supra* [281 U. S. 376], p. 378. Cf. *Burnet* v. *Guggenheim, supra* [288 U. S. 280], p. 283. Refinements of title have at times supplied the rule when the question has been one of construction and nothing more, a question as to the meaning of a taxing act to be read in favor of the taxpayer. Refinements of title are without controlling force when a statute, unmistakable in meaning, is assailed by a taxpayer as overpassing the bounds of reason, an exercise by the lawmakers of arbitrary power. In such circumstances the question is no longer whether the concept of ownership reflected in the statute is to be squared with the concept embodied, more or less vaguely, in common law traditions. *The question is whether it is one that an enlightened legislator might act upon without affront to justice. Even administrative convenience, the practical necessities of an efficient system of taxation, will have heed and recognition within reasonable limits."* (Emphasis supplied.)

There is little doubt that if this tax on the carrier were required to be computed at a flat rate, or measured by the

gross receipts of the carrier from its use of the State's highways, that the liens here asserted on all vehicles in the carrier's fleet of trucks (although subject to conditional sales) would be valid as a reasonable means of enforcing such an unallocable tax. The State has no less a constitutional right to prescribe and enforce its lien where, as here, the tax on the carrier is allocable because computed in close proportion to the actual burden placed on the highways by the respective trucks operated by the carrier. In either case, the tax is owed by the carrier and the need for an effective lien to enforce it is all the more necessary where, as here, the tax cannot be computed or readily collected in advance.

The judgment of the Court of Appeals of the State of New York, accordingly, is

*Affirmed.*

Mr. Justice Black concurs in the result.

Mr. Justice Harlan took no part in the consideration or decision of this case.

Mr. Justice Frankfurter, with whom Mr. Justice Douglas concurs, dissenting.

So far as the United States Constitution limits them, the States have the amplest scope in imposing highway taxes and devising relevant means for enforcing them. Within the vast range of its discretionary taxing power, a State may provide that a creditor who adds to the corpus of equipment used by his debtor on the State's highways cannot be heard to complain if his equity in such equipment is subordinated not only to tax liens on that specific equipment, but also, as is true of the New York State legislation, for tax liens incurred by all the debtor's vehicles for the entire period during which the creditor has enabled his debtor to have added vehicles on the road. As a practical matter, the carrier's creditor may

well have adequate means of protecting himself regarding the incidence of highway taxes and their default during the whole of the period that such creditor helped to enhance the totality of vehicles used by the carrier.

We therefore agree with the Court that taxes incurred by all the vehicles in Eastern's service during the period that the three International Harvester tractors were on the road may be collected by way of enforcing tax liens for such total taxes against the three International tractors. It is immaterial that these three tractors were held under a credit arrangement whereby International Harvester reserved interest in them by way of security for payment of their purchase price.

A very different situation is presented for such part of the taxes as are sought to be collected by way of lien out of these International Harvester tractors for the period antedating their conditional sale to Eastern.

Property is included within the triad of interests protected by the Due Process Clause of the Fourteenth Amendment—"nor shall any State deprive any person of life, liberty, or property, without due process of law." When one man's property is taken and given to another or, as in this case, is taken to satisfy the debts of another, a justifying public purpose must meet the requirements of the Due Process Clause. See *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55, 79–80.

It is one thing for a creditor, who has enabled his debtor to hold himself out as having dominion over property which the creditor has placed within his debtor's control, to suffer for debts incurred by his debtor to third persons. It is quite another thing to saddle such creditor's property with satisfaction of prior obligation to a third person when the creditor had no means whatever of safeguarding himself against the enforcement of such third-party indebtedness. Nor does it matter that the third party is the State.

In the situation before us, International Harvester had no means of protecting itself against highway taxes incurred by Eastern prior to the time that it put its three tractors into Eastern's hands. It is admitted that under New York law in force at the time of the conditional sale of these tractors, International Harvester could not possibly have protected itself against the losses to which it is now subjected except by avoiding such sales. It could not possibly have ascertained the tax liabilities of its conditional vendee prior to the credit arrangement in the sale of these tractors. It could not have informed itself by examining the tax returns of its vendee. New York made it a misdemeanor for any state official to divulge such information. N. Y. Tax Law, Art. 21, § 514. Thus, there is no connection whatever between the undoubted property interest that International Harvester had in the three tractors and the extent of the lien that the State sought to foreclose in·them. When one considers the important rôle played in our economy by credit sales, it will hardly do for the law to deem such transactions extrahazardous and subject such creditors to an insurer's risks.

We would therefore remand the case to the New York courts in order to restrict the enforcible lien in appellant's tractors to the highway taxes incurred by Eastern for the period that appellant's vehicles were in Eastern's service.